U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED
2012 DEC -6 P 2:25
JON A. SANFILIPPO
CLERK

Case No. 12-C-1242

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

---

ROGER A. PELLMANN,

Petitioner,

v.

UNITED STATES OF AMERICA,

Respondent.

---

## MEMORANDUM IN SUPPORT

### of Petitioner's Request for Relief
### Pursuant to 28 U.S.C. § 2255
### Criminal Case No. 10-CR-~~104~~ 14

Honorable Judge Charles N. Clevert, Jr.

---

Roger A. Pellmann, Pro se
Registration No. 10399-089
FCI Morgantown
P.O. Box 1000
Morgantown, WV 26507-1000

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
FILED

2012 DEC -6 P 2:25

JON A. SANFILIPPO
CLERK

ROGER A. PELLMANN, )
)                         12-C-1242
       Petitioner, )          Case _____ Pro
)                         (Crim. Case No. 10-CR-~~104~~)
)                                                      14
v. )          JUDGE CHARLES N. CLEVERT, JR.
)
)
UNITED STATES OF AMERICA, )
)
       Respondent. )

---

### PETITION FOR RELIEF PURSUANT
### TO 28 U.S.C. § 2255

---

NOW COMES Petitioner, ROGER A. PELLMANN, proceeding <u>pro se</u>, and requests that this Honorable Court vacate his conviction and sentence in the criminal case tried by this Court, pursuant to 28 U.S.C. § 2255, for the reasons stated in the accompanying <u>Memorandum in Support</u> thereof. In essence, Petitioner lacked effective assistance of counsel during the trial of his case, and such ineffectiveness meets the two pronged test established by the U.S. Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668, 80 L. Ed. 674, 104 S. Ct. 2052 (1984) whereby but for the ineffectiveness of counsel, it is reasonable to conclude that the results of his trial would have been different.

                                          Respectfully submitted,

                                          *Roger A. Pellmann*
                                          Roger A. Pellmann, <u>Pro se</u>

# TABLE OF CONTENTS

| | Page |
|---|---|
| TABLE OF AUTHORITIES................................................................. | ii |
| JURISDICTION........................................................................ | 1 |
| STATEMENT OF FACTS.................................................................. | 2 |
| STATEMENT OF THE CASE............................................................... | 2 |
| INTRODUCTION........................................................................ | 3 |

ARGUMENTS

| | |
|---|---|
| I. FAILURE OF DEFENSE COUNSEL TO OBTAIN MEDICAL RECORDS AND TO USE EXPERT TESTIMONY CONSTITUTED INEFECTIVENESS OF COUNSEL.......................................... | 4 |
| II. FAILURE BY DEFENSE COUNSEL TO PREPARE AND EFFECTIVELY CROSS EXAMINE AND IMPEACH PROSECUTION WITNESSES..................... | 9 |
| III. DEFENSE COUNSEL FAILED TO REQUEST THAT THE COURT PROVIDE A CORRECT JURY INSTRUCTION ON THE 21 U.S.C. 843(a)(3) CHARGES THEREBY LEADING TO PETITIONER'S CONVICTION ON SUCH CHARGE........... | 14 |
| REQUEST FOR EVIDENTIARY HEARING..................................................... | 16 |
| CONCLUSION.......................................................................... | 16 |

## TABLE OF AUTHORITIES

Statutes                                                           Page

21 U.S.C. § 822(b).................................................. 8

21 U.S.C. § 829(a).................................................. 6

21 U.S.C. § 829(a)(b)............................................... 8

21 U.S.C. § 841(a)(1).............................................. 2,8

21 U.S.C. § 843(a)(3)......................................... i,2,14,15

21 C.F.R. § 1306.04(a)(1973)........................................ 8

28 U.S.C. § 2255.................................................... 1

Rules

Rule 8, Rules Section 2255 Proceedings............................. 16

Cases

Machibroda v. United States, 368 U.S. 487(1962).................... 16

Strickland v. United States, 466 U.S. 668, 80 L. Ed. 674, 104 S. Ct.
                             2052 (1984)........................ passim

United States v. Bartee, 479 F. 2d 484 (10th Cir. 1973)............. 8

United States v. Black, 512 F. 2d 864 (9th Cir. 1975).............. 8

United States v. Chube, 538 F. 3d 693 (7th Cir. 2008).............. 8

United States v. Goldstein, 695 F. 2d 1228 (10th Cir. 1981)........ 8

United States v. Kirk, 584 F. 2d 773 (6th Cir. 1978)............... 8

United States v. Pellmann, 668 F. 3d 918 (7th Cir. 2012)........... 2

United States v. Seelig, 622 F. 2d 207 (6th Cir. 1980)............. 8

United States v. Smurthwaite, 590 F. 2d 889 (10th Cir. 1979)....... 8

United States v. Wilbur, 59 F. 3d 1291 (8th Cir. 1996)............ 15

## JURISDICTION

This Honorable Court has jurisdiction to hear this Petition in that Petitioner meets the necessary requirements under 28 U.S.C. § 2255 for such consideration.

1) Petitioner is currently incarcerated at FCI Morgantown, Morgantown, West Virginia, where he has been housed beginning December 16, 2010.

2) Subsequent to the trial of the criminal case, Petitioner filed an appeal with the United States Court of Appeals for the Seventh Circuit, challenging his conviction and this Court's imposition of a sentence enhancement. The Court of Appeals denied the requested relief and issued an opinion date February 10, 2012. Thus, this Petition for Relief is timely filed.

3) Counsel for Petitioner failed in his duty to represent his client to the extent required for "effective counsel." Thus, Petitioner was denied his Sixth Amendment right under the United States Constitution to "effective counsel." But for errors and omissions of counsel, the decision in this case would have been different. Petitioner meets the test established in Strickland V. Washington, 466 U.S. 668, 80 L. Ed. 674, 104 S. Ct. 2052 (1984), and the cases that followed, to establish that, but for such errors and omissions of counsel, his conviction would not have occurred.

Thus, jurisdiction clearly lies with this Court to hear and favorably determine the issues presented by Petitioner.

## STATEMENT OF FACTS

The disputed issue of fact are noted throughout this petition.

## STATEMENT OF THE CASE

The Petitioner was convicted by a jury of violations of 21 U.S.C. § 841(a)(1) and 843(a)(3) on June 4, 2010. Petitioner had been charged under 16 counts of an indictment issued February 2, 2010. Counts 1 through 10 alleged that Petitioner had unlawfully distributed Fentanyl, a Schedule II controlled substance, "outside of his professional practice and not for a legitimate medical purpose." Counts 11 through 16 alleged that Petitioner had obtained another Schedule II controlled substance, morphine, "by misrepresentation, fraud and deception." Defendant was subsequently convicted of these charges and sentenced to a term of incarceration of 48 months, with 36 months of supervised release. The court added a two level upward adjustment for obstruction of justice, with the final judgement entered by this Court on November 8, 2010. A Notice of Appeal was timely filed on October 14, 2010.

Two issues were presented to the Court of Appeals, which follow:

I. The evidence was insufficient to convict Defendant-Appellate of distributing controlled substances outside the scope of his professional practice and without a legitimate medical purpose; and

II. The obstruction of justice enhancement was improperly applied in this case where the testimony was not false and even if false, was immaterial to the conviction.

The Court of Appeals thereafter denied the requested relief with an opinion dated February 10, 2012, in <u>United States v. Pellmann</u>, 668 F.3d 918 (7th Cir. 2012).

2

## INTRODUCTION

This matter now returns to this Court to consider the question of whether or not the Petitioner received ineffective assistance of counsel in both trial preparation and trial representation.

What occurred in this matter was the unfortunate confluence of an overreaching and concocted prosecution (in a case that should have <u>never</u> have been brought) flowing together with a poorly prepared and inadequate defense of a Medical Doctor, <u>who while he did not violate the law</u>, but was careless in his record-keeping and overall professional responsibility.

This Memorandum details incidents of counsel's failure, **which are not apparent when one considers the trial transcript.** Major areas of ineffectiveness being counsel's failure to obtain and use the medical records of the principle patient who was subject of the prosecutor, the failure to provide expert testimony as to her medical treatment, and the unobjected to erroneous jury instruction given by the Court on the charge regarding morphine ( Counts 11-16 ).

These errors were so significant that one must conclude that singularly, and certainly considered cumulatively, the jury would not have found Doctor Pellmann guilty of any criminal offenses.

Expert testimony for the defence would have provided necessary objective testimony that this case is <u>not</u> about a medical doctor operating a "pill mill" and there was no pecuniary gain whatsoever to Dr. Pellmann. He has admitted, however, that he made mistakes in documenting his overall approach in treating Ms. Evans. This is a medical ethics/ procedures matter - not a crime. In fact, the goverment did not use an expert witness to suggest that Ms. Evans' medical treatment by Dr. Pellmann was improper as the prosecution knew that the medical treatment was <u>not</u> improper or illegal medical practice.

3

## ARGUMENT

### I. FAILURE OF DEFENSE COUNSEL TO OBTAIN MEDICAL RECORDS AND USE EXPERT MEDICAL TESTIMONY CONSTITUTED INEFFECTIVENESS OF COUNSEL.

The fundamental underlying question in the prosecution of Petitioner was whether or not his patient, Ms. Evans was being treated in a medically acceptable manner. Obviously, dispensing, administrating and prescribing controlled substances to a patient for pain relief is not criminal. In this case per the distortion painted by the government, the jury was led to believe that Dr. Pellmann's treatment protocol was not only improper, but illegal.

To counter the government's distortions, counsel should have have placed into evidence the medical records of Ms. Evans so they could be discussed by the "phantom" disinterested medical expert. These records, which were submitted with this Memorandum under seperate cover, conclusively document the treatment Ms. Evans received from various health care professionals for her medical condition. Such introduction therefore would have provided a reasonable alternative for the jury's consideration. There was ongoing documentation of the medical condition suffered by Ms. Evans. <u>Despite the insistance of Petitioner to obtain and utilize such medical records, Counsel did NOT seek to do so.</u> His refusal to use them in the defense of Petitioner was a critical error that substantially impacted this case. Ms. Evans' subsequent affidavit will reflect that, that she would have consented to the use of such medical records. Petitioner has never been provided with an explanation for the failure of his lawyer to have obtained and introduced such medical record at trial. If the records had been provided, a medical expert would have reviewed and testified as to the medical regimen undertaken, and provided testimony that it was medically "acceptable". Again, despite the inquires made by Petitioner, his counsel rejected the suggestion

4

and determined to proceed solely with the testimony of Dr. Pellmann as the expert. Consequently, the jury was never given the opportunity to hear about the doctor's medical conduct from an unbiased source.

The jury conclusively demonstrated that its decision was impacted by the failure to call an unbiased expert when it submitted the following question to the judge during its deliberations:

> "Was the diagnosis of trigeminal neuralgia by any medical professional other than Dr. Pellmann ever presented as physical evidence at trial, and if so, which exhibit number?" (Trans. 904(22-25)).

Implicity then, the jury was seeking for verification of a defense that the charge brought under 841 was not proper, and that the treatment was medically acceptable. Apparently, had there been expert testimony from another qualified professional other than Dr. Pellmann, then the verdict of the jury would have been otherwise.

Petitioner submits that testimony based on the medical records <u>would have provided</u> the jury with the following relevant facts and events as follows:

> In March, 2009, Ms. Evans requested a referral to an oral surgeon from her personal physician from 2005, Dr. Pellmann. Her dentist had attempted a third root canal surgery which was terminated due to extreme facial pain. Her dentist advised her to have an oral surgeon extract the tooth. She described excruciating and severe pain, radiating along a nerve (neuropathic pain) consistent with Trigeminal Neuralgia. Dr. Pellmann referred Ms. Evans to his own personal oral surgeon, Dr. Bissel, as her neuralgia appeared to have a dental etiology. Dr. Pellmann, at the direction of the oral surgeon, continued the patient's pain treatment regimen.
>
> Dr. Pellmann's referral and the oral surgeon's request for assistance met the standard of care for the diagnosis of Acute Trigeminal Neuralgia. All medications prescribed by Dr. Pellmann were clearly within FDA

5

(Food and Drug Administration) approved dosing guidelines. Although physicians are not bound to FDA approved medication guidelines, conforming to these guidelines is the usual course of professional practice in the United States. While high doses of pain medication are medically indicated for cases of Trigeminal Neuralgia, the dosing and total quantity of medication was far lower here, in the low/moderate range. While Dr. Pellmann's patient sought the care of multiple dental experts, he monitored and supervised her successful pain relief caused by probable negligent root canal drilling, and successfully treated her jaw infection (mandibular osteomyelitis) and dehydration.

Thereafter, Dr. Pellmann made other referrals including his own personal dentist and consulted a neurologist. Understanding that Dr. Pellmann with Internal Medicine education and qualifications, as an experienced physician was certainly qualified to prescribe such medication, his assessment of his patient's condition was confirmed by others. All prescription records required by law were maintained. Under the Controlled Substance Act there is an exception to the required written record (U.S.C. 829(a)) when a physician directly dispenses to the ultimate user.

There was no indication of any abuse of medication or signs or symptoms of addiction, nor did any over-prescribing occur as defined by the FDA. A competent medical expert would have confirmed this to be the case. A medical expert would have known that Dr. Pellmann routinely treated neuropathic pain in his practice and providing similar care to this patient was not unusual.

In respect to Ms. Evans, a medical expert would have reviewed all of the records confirming her unequivocal, undisputed legitimate medical condition, and would have opined that that the hallmark of addiction is a poor medication

6

response. This, then, would overcome the concern that this patient had successful pain relief. Furthermore, a medical expert would have known that addication is rare in patients seeking pain relief, even with high dose opioids, with the incidence reportedly occurring less than 0.05% of the time. Ms. Evans received low/moderate dosing making the incidence even more implausible. In particular, a medical expert would have testified that fentanyl ampules prescribed to the patient were the most dilute form of this medication available with a duration of action of only 30 minutes, thus requiring several ampules per dose, and a frequency of up to 20 times per night. This quantity of medication was far too low to result in the physiologic response of euphoria.

In November 2009, based on false accusations from the patient's sister-in-law ( Dr. Pellmann refused to supply drugs to Lisa Evans, who has a history of criminal abuse of drugs, and multiple shoplifting convictions) the DEA crafted a fictitious affidavit and abruptly terminated Dr. Pellmann's patient's medical care (violating the DEA's stated policy not to interfere with patient care). This caused life threatening withdrawal in this patient. A medical expert would have criticized the DEA's action which was not only medically contrary, but endangered Ms. Evans. She thereafter suffered immeasurably from the untreated and extreme pain of her disease. Consistent with the medical tenet, continuity of care, Dr. Pellmann provided medically indicated treatment and arranged transfer of her care to Diamond Headache Clinic in Chicago, in direct conflict with the government's forced abandonment by Dr. Pellmann of his patient and her care.

**Dr. Pellmann specifically recommended that Dr V. Misra act as an expert in his case,** as he was her treating physician prior to trial and is presently treating Ms. Evans, more than 3 years later, with the same classes of medication that Dr. Pellmann prescribed.

7

Numerous Circuit Courts (United States v. Goldstein 695 F. 2d 1228 (10th Cir 1981)),(United States v. Seelig 622 F. 2d 207 (6th Cir 1980)), (United States v.Smurthwaite 590 F.2d 889 (10th Cir 1979)),(United States v. Kirk 584 F. 2d 773 (6th Cir 1978)),(United States v. Black 512 F. 2d 864 (9th Cir 1975)),(United States v. Bartee 479 F. 2d 484 (10th Cir 1973)), have held that a registered physician who dispenses controlled substances for valid medical reasons is immune from prosecution under section 21 U.S.C. 841 (a)(1). This immunity is inferred from 21 U.S.C. 822 (b) or from a joint reading of 21 U.S.C. 829 (a),(b) and 21 C.F.R. 1306.04 (a)(1973).

As the case played out, defense counsel's decision not to use the testimony of a defense expert played directly into the strategy developed by the government, being to obfuscate and confuse the jury with non-medically related displays. Thus, the representions of the many ampules of fentanyl merely pandered to the jury. Not once did the government ever show that the treatment protocol was improper. It could not do so.

The government routinely uses expert testimony in its efforts to convict in §841 cases. The standard applied by the courts is that the government had the burden and had to prove that "the doctor knowingly and intentionally acted outside the scope of professional practice without a legitimate medical purpose," United States v. Chubbe, 538 F.3d 698, 698 (7th Cir. 2008). Thus, the lack of such expert testimony had to be for a reason, and the conclusion should have been that they could not find an expert to so testify.

The lack of strategy here is evident. If the Petitioner's counsel had provided expert testimony, then it may not have been necessary to rely on the testimony of Dr. Pellmann as to the medical necessity of her treatment. As his counsel was well aware, Dr. Pellmann was not likely to be a good witness. He had never testified before. Needless to say, he was anxious about testifying and, his testimony as an "expert" was with his self-interest. Had his defense

8

counsel simply used a medical expert, the burden for Dr. Pellmann would have
been lifted. Based on all of the evidence presented and the question asked by
the jury during deliberations, it is abundantly clear that the Petitioner meets
the Strickland test - that his attorney's failure was so catastrophic as to
defy any sense whatsoever. There can be no reason why a competent, effective
attorney would have refused to present both the medical records of Ms. Evans
and an expert to discuss the appropriateness of the treatment. Had he done so,
Dr. Pellmann would have been found "not guilty" of the charge. The Petitioner's
defense was like a bicycle missing one wheel. When Petitioner questioned his
counsel about expert testimony, the response from him was that the Petitioner
could provide such evidence. Obviously, the second wheel was missing and
resulted in a verdict against the Petitioner.

## II. FAILURE BY DEFENSE COUNSEL TO PREPARE AND EFFECTIVELY CROSS EXAMINE AND IMPEACH PROSECUTION WITNESSES.

A key function of a defense attorney is to protect his client from due
process abuses by the prosecution. One of the underlying issues here is the
falsification of evidence by DEA agent Frederico and in the effort to mislead
the jury. Agent Frederico claimed that 144 ampules of Fentanyl, this amount
would be contained in 2 boxes(50 ampules each) 4 trays(10 ampules each) and
one open tray with 4 ampules, were removed from the locked cabinet in the
Interventional room of the clinics (Trans. 146(3-10), 181(19-25), and 182
(1-25)). She testified twice that there were three boxes, and one to two trays
of Fentanyl in the cabinet, which would have totaled 160 to 170 ampules (Trans.
115(16-22), 183(1-7), 362(1-8) and 364(4-11)). On January 14, 2010, Dr. Pellmann
inspected the narcotic cabinet after disgarding two empty boxes, 5 boxes, two
trays and one open tray with one ampule for a total of 271 remained. He locked
the cabinet and the keys were given to the DEA agents. The difference from
271 and 144 is 127. The cabinet was empty. Since 127 ampules were not placed

into evidence, the missing 127 ampules represents illegal possession by one or more DEA agents. Not only were these facts not brought forth, defense counsel failed to expose the flagrant discrepancy in agent Frederico's testimony.

Defense counsel had other opportunities to deminish the agent's credibility. As an example the pictures taken by DEA agents at Petitioner's home. Here, agents Conner and Ceran photographed a bar-coded box of medical supplies in the bathroom of Petitioner. The <u>same</u> bar-coded box was then photographed in the living room, with its contents scattered over the living room furniture (Trans. 219(13-23), 223(1-8) and 767(18-21)). In addition, the agents photographed trash removed from disposal containers, which they had scattered around, and then claimed that this was the way they found the premises (Trans. 225(16-25), 226(1-17) and 709(6-11)). Defense counsel should have pointed out that the same bar-coded box could not have been in two locations and could have asked the government to produce the two boxes from the evidence, an impossibility since there was only one box. This pattern of criminal wrongdoing is exemplified by the fact that agents Conner and Ceran stole my high definition camcorder on November 12th 2009, during my home search. The camcorder was not listed as evidence in the items removed from my home. Complaints of this theft were made to agent Frederico. My office in the clinics was searched by agent Frederico on January 14th 2010. The following day upon return to my clinic office, I found the missing camcorder on my desk, left on, the battery dead and 20 minutes of video of my childern's activities erased. In addition, my physicians lab coat (symbolic of the medical profession) was removed from its hanger, rolled into a ball and stuffed into a corner of my closet.

Other examples of the DEA agents distorting evidence that went unchallenged by defense counsel included the removal of the September and October entries and pages of the administration log book which disappeared after their

10

search on November 12, 2009 (Trans. 702(14-23). Since the State regulates medical practice, the State drew up practice stipulations based on false information from the DEA. In July, counsel advised Petitioner to enact the State stipulations. Dr. Zelco agreed to provide oversight to medication administration used in the clinics. The clinics acquired place of business DEA registrations and schedule IV medication was purchased for use at the clinics. On July 30, 2010, Petitioner was then told by his counsel not to possess any medication, contrary to state stipulations, so we disposed of some 40 vials of midazalom. Having done so, and when confronted by the DEA, the agents thereafter claimed that these still wet vials were "missing." That Petitioner had caused the vials to be emptied into a sink was obviously intentionally distorted by the government. (It should be noted that the day prior our medication counts were correct, as Petitioner had instructed the clinic supervisors to constantly observe the DEA agents counting our medication). Defense counsel did nothing to thus attack the credibility of these witnesses, leaving the impression that medication was unaccounted for. The ineffectiveness of counsel also was apparent when the government intentionally confused not only the jury, but also the Court, into believing that addiction was synonymous with withdrawal. This falsehood went unchallenged, and exemplified the type of testimony elicited by the prosecution of its witnesses that would have been corrected by a disinterested expert witness.

Defense counsel refused to challenge the assertions and "medical opinions" of DEA Agent Frederico that the patient was an "addict" (Trans. 689(19-25), 690 (1-11) and 704(17-24). Whereas, a qualified medical expert would have testified that drug abuse and addiction are seperate and distinct from tolerance and physical dependency, with the latter, a not uncommon consequence of medical treatment.

The government also sponsored false testimony through Agent Frederico that Petitioner had falsified medical records. Following a search of the

11

Petitioner's medical clinic's office, the agents left the principle patient's medical records openly displayed, in plain sight in a large gap in the files. The government's witness then claimed that there were no records (Trans. 149 (14-22) and 131(6-16)). The progress notes, including the diagnosis, treatment and referrals were emailed to the prosecutor that morning, who then claimed the records were fake and had been created after the search, even though the Petitioner had been taken into custody. Defense counsel should have asked why the government did not investigate to determine when Azithromycin and Gabapentin prescriptions were filled and referrals to other practioners were made, as this would have established the validity of Ms. Evans' medical records.

Petitioner requested his counsel to subpoena Lisa Evans to reveal that she was the envious drug seeking sister-in-law who perpetrated a malicious hoax. Instead, the prosecutor portrayed her as "a citizen" (Trans. 8(10). Defense counsel's refusal to allow the Petitioner the opportunity to confront his accuser denied him his Sixth Amendment right of confrontation revealing DEA's coercive witness-coaching and more importantly a complete defense.

Perhaps most egregious of all of the failures of defense counsel was his failure to inform the Court of a breach of required conduct of a witness. Ms. McGrath, who testified and then posted prejudicial communication, discussing the trial, on the social media-facebook while the trial was in progress, thus defying the Court's order. When defense counsel was notified of this transgression, he discussed it with the prosecutor, whose response was **laughter**. If defense counsel or prosecutor had reported this breach, defense counsel could have used such breach to his client's advantage. In addition, bringing to question Ms. McGrath's motives, as her employment was nearly terminated by Ms. Evans in December 2009, for improper patient care.

The government/DEA also violated HIPPA regulations as they had Dr.

Pellmann's patients's name and health condition published in the Milwaukee Journal/Sentinel, without her release, in January 2010. The misinformation campaign was even evident here, as the newspaper article stated that Dr. Pellmann gave Ms. Evans narcotics for an impacted tooth - a condition she never had.

Agent Frederico also testified, and improperly so, that there was a "patient-client" relationship between Dr. Pellmann and his patient. Whereas, a bona fide "doctor-patient" relationship existed since 2005, as reflected in her records and prescription history. Frederico, who is not a medical expert, further conjectured that his treatment was "outside of the scope of his practice" (Trans. 139(8-13), 156(6-17), 163(1-5), 705(13-23) and 707(11-15).

Agent Reid's analysis of the number of prescriptions for Ms. Evans never took into account that the dosing was all within FDA guidelines and quantity never exceeded a 3 to 7 day supply. Importantly, this analysis, included only the pharmacy that Ms. Evans frequented, represented statistically a gross sampling error designed to thoroughly mislead the jury (Trans. 85(10-21) and 86(14-22)). Prosecutor-sponsored false testimony was in part challenged by counsel, but omissions and fabrications were never succinctly revealed.

Perhaps most telling of the distortion painted by Agent Frederico was the transposition of the names of Dr. Jensen for Dr. Bissel (Trans. 141(1-14), 165(5-25), 704(7-16), 793(3-5) and 793(20-22)). Dr. Jensen and Dr. Pellmann both testified that they never spoke to each other. Frederico's prevarication resulted in a sentence enhancement and an additional 12 months incarceration for Petitioner. This transposition could have been overcome by defense counsel either by obtaining an affidavit from Dr. Bissel, or his deposition testimony. Neither was done.

13

### III. DEFENSE COUNSEL FAILED TO REQUEST THAT THE COURT PROVIDE A CORRECT JURY INSTRUCTION ON THE 21 U.S.C. §843(a)(3) CHARGES THEREBY LEADING TO PETITIONER'S IMPROPER CONVICTION ON SUCH CHARGE.

Another major question to be provided at the Petitioner's trial involved the issue of the acquisition of morphine.

Section 21 U.S.C. §843(a) reads as follows:

> "It shall be unlawful for any person knowingly or intentionally --(3) to acquire or obtain possession of a controlled substance by misrep-presentation, fraud, forgery, deception or subterfuge."

The unobjected to jury instruction for the §843 charge changed the prohibited conduct and read as follows:

> "Roger A. Pellmann, M.D. did knowingly and intentionally acquire morphine sulfate, a schedule II controlled substance, in the approximate quantities indicated, by misrepresentation, fraud and deception, in that Pellmann issued prescriptions to pharmacies and submitted order forms, DEA Forms 222, to prescription drug suppliers to obtain morphine sulphate representing that the morphine sulfate would be used in the operation of his clinic, when, in fact, as Pellmann knew, he obtained the morphine sulfate to administer to himself and others not within the scope of his professional practice." (Trans. 884(9-21)).

Not disclosed to the jury by his counsel was the fact that Dr. Pellmann's authorization to acquire controlled substances was through the DEA's registration of him as an <u>individual practitioner</u>, not as a place of business registration. What Dr. Pellmann did was to order by prescription, and to use form 222's to acquire controlled substances (morphine), and that is what ALL physicians do in acquiring medication for their practices.

Had his counsel responsibly reviewed the statue, counsel would have known and argued that criminal conduct would be applicable to those who "acquired or obtained possession" <u>by</u> "misrepresentation, fraud, forgery, deception or subterfuge". The Petitioner, as a licensed and registered physician, was able to obtain controlled substances to be used in his practice. There is no showing that he <u>ever</u> "acquired or obtained possession" illegally.

In fact the jury instruction goes on to make it appear that it is a crime to take such controlled substances outside of his clinic, and then "to

14

administer to himself and others..." Clearly, this language far expands the plain meaning set forth in the statute, and far expands the definition of a crime thereunder. This instruction effectively makes housecalls illegal. It is of interest, that our legislators have legally defined not only the location, but have determined the nature and scope of a physician's practice. As follows: **A physician's practice includes not only their office but wherever the physician is practicing and by extension includes their patients and the self-administration of medication.** That counsel did not object and the Court made the erroneous instruction is exactly the type of ineffectiveness assistance that meets the test in Strickland, supra.

In the case of United States v. Wilbur, 58 F.3d 1291 (8th Cir. 1995), the Court held that the defendent, a medical doctor, should not have been convicted under 21 U.S.C. 843(a)(3), because he did not engage in "trickery" to obtain the drug. The Court discussed the application of § 843(a)(3) and concluded that the focus of the statute is on how the physician obtained the drug, not what he did with it thereafter. Thus, the inclusion of the additional language in the jury charge was improper. Had counsel been prepared and effective, he would have known that the standard established is that there be no "trickery" **in obtaining** the controlled substance for use in his practice. Under Strickland, supra., Dr. Pellmann has met the test of having ineffective assistance of counsel, and must be granted habeas relief on Counts 11-16.

Finally, counsel knew Petitioner strongly objected to the numerous fabrications, distortions and omissions of relevant facts in his P.S.I. report. Recently, Petitioner discovered that counsel signed off on this document without any objection or any attempt to correct the untruthfulness, thus, epitomizing the pattern of ineffectiveness.

15

### REQUEST FOR EVIDENTIARY HEARING

Petitioner requests an evidentiary hearing on all disputed issues of fact that arise in this proceedings. Rule 8, Rules Section 2255 Proceedings. See Machibroda v. United States, 368 U.S. 487, 494, 495 (1962), et.al..

### CONCLUSION

Based upon the foregoing, the Petitioner is entitled to habeas relief.

Respectfully submitted,

Roger A. Pellmann, M.D.   Pro Se