UNITED STATES DISTRICT COURTS
EASTERN DISTRICT OF WISCONSIN

ROGER A. PELLMANN,

        Petitioner,

        v.                                          Case No. 12-C-1242

UNITED STATES OF AMERICA,

        Respondent.

ORDER DENYING MOTION PURSUANT TO 28 U.S.C. § 2255 (DOC. 1),
DENYING MOTION FOR ORDER TO CONVERT WRIT OF HABEAS CORPUS TO
CORAM NOBIS (DOC. 11), DENYING CERTIFICATE OF APPEALABILITY,
AND DISMISSING CASE

Roger A. Pellmann is proceeding pursuant to 28 U.S.C. § 2255 challenging his conviction following a jury trial in *United States v. Pellmann*, Case No. 10-CR-14, on ten counts of unlawfully distributing fentanyl in violation of 21 U.S.C. § 841(a)(1), and six counts of obtaining morphine by misrepresentation, fraud, and deception in violation of 21 U.S.C. § 843(a)(3). The court sentenced Pellmann to 48 months on each count, and directed that the sentences run concurrently. A three-year period of supervised release was also imposed. After hiring new counsel for his appeal, Pellmann argued that the government failed to introduce expert testimony to prove that he had distributed Schedule II narcotics outside of his professional practice for other than a legitimate medical purpose. Additionally, Pellmann asserted that the court improperly enhanced his sentence for obstruction of justice. The Seventh Circuit Court of Appeals affirmed the conviction finding the "evidence is not only sufficient to support the jury's conviction, it is overwhelming." *United States v. Pellmann*, 668 F.3d 918, 925 (7th Cir. 2012). For the reasons set forth below, the pending motion to vacate filed pursuant to 28 U.S.C. § 2255 will be denied.

Before turning to the merits of Pellmann's § 2255 motion, the court is mindful that Pellmann has asked that his petition for writ of habeas corpus be converted to a petition for writ of coram nobis. A writ of error coram nobis is traditionally brought to vacate a federal conviction where the sentence imposed has already been served. *United States v. Morgan*, 346 U.S. 502, 74 S. Ct. 247, 98 L. Ed. 248 (1954). However, it is not available to an incarcerated prisoner and is "limited to former prisoners who seek to escape the collateral civil consequences of wrongful conviction." *Owens v. Boyd*, 235 F.3d 356, 360 (7th Cir. 2000), as amended (Jan. 22, 2001) (*citing United States v. Morgan*, 346 U.S. 502, 74 S. Ct. 247, 98 L. Ed. 248 (1954)); *See also Guyton v. United States*, 453 F.3d 425, 427 (7th Cir. 2006). Because Pellmann was in custody when he filed the pending § 2255 motion and commenced his 36-month term of supervised release on January 21, 2014, § 2255 relief is still available because supervised release is classified as a form of custody. *Clarke v. United States*, 703 F.3d 1098, 1101–02 (7th Cir. 2013) (emphasis added).

In support of his § 2255 motion, Pellmann asserts that he was denied effective assistance of counsel. An ineffective assistance of counsel claim "may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." *Massaro v. United States*, 538 U.S. 500, 504 (2003). Pellmann can sustain a claim for ineffective assistance of counsel if "(1) his counsel's performance fell below an objective standard of reasonableness; and (2) the deficient performance so prejudiced his defense that it deprived him of a fair trial." *United States v. Hall*, 212 F.3d 1016, 1021 (7th Cir. 2000) (citing *Strickland v. Washington*, 466 U.S. 668, 688–94 (1984)).

To this end, Pellmann explains that his conviction was the result of "overreaching and concocted prosecution" "flowing together with a poorly prepared and inadequate

2

defense of a Medical Doctor" who is guilty of nothing more that careless record-keeping and overall professional responsibility. First, he attacks counsel's failure to procure and utilize medical records of Jacqueline Evans and asserts that the government did not use an expert because the prosecution knew that his medical treatment was not improper or illegal.

Pellmann has submitted medical records in support of this claim. According to his assessment, testimony regarding these records would have established that Evans requested a referral to an oral surgeon in March of 2009 after her dentist attempted a third root canal surgery resulting in extreme facial pain consistent with Trigeminal Neuralgia. While Pellmann referred Evans to Dr. John Edward Bissel, he contends that he continued with her pain treatment regimen at Bissell's request. It is Pellmann's belief that the fentanyl administered or prescribed to Evans was within FDA approved dosing guidelines and high doses of pain medication are medically indicated for the treatment of Trigeminal Neuralgia. Pellmann submits that he made additional referrals, consulted a neurologist, and his assessment was confirmed by others. He believes a medical expert would have known that addiction is rare in patients seeking pain relief even with a high does of opioids. According to Pellmann, he recommended that Dr. V. Misra act as an expert in this case.

The problem with Pellmann's arguments is that the jury was provided with extensive testimony and records regarding Evans's medical history. Evans testified that Pellmann started prescribing vicodin for her neck and back pain in early 2008 related to injuries that Pellmann confirmed with MRIs. (No. 10-CR-14, Doc. 33, Tr. 397.)[1] Evans conceded that

---

[1] The citation to the docket entry includes a reference to the page of the transcript rather than the page of the ECF filing.

she had "quite a few" prescriptions for controlled substances from Pellmann and that the evidence from Walgreens indicated that there were more than 140 prescriptions from September 1, 2007, through August 31, 2009 (an average of six per month). (No. 10-CR-14, Doc. 33, Tr. 399.) Notably, there were four occasions when Pellmann provided Evans with controlled substance prescriptions in her daughter's name. (No. 10-CR-14, Doc. 33, Tr. 400.)

Evans considered Pellmann to be her treating physician even though he was an interventional radiologist. In late 2008 or early 2009 he started prescribing fentanyl for her migraines. (No. 10-CR-14, Doc. 33, Tr. 402-404.) He came to Evans's fiance's home with an IV bag, lines, syringe, and needle, and administered the fentanyl through an IV. (No. 10-CR-14, Doc. 33, Tr. 405.) In March of 2009, Pellmann gave Evans fentanyl for mouth pain and abscesses, which began after she was treated by Dr. Ciatti. (No. 10-CR-14, Doc. 33, Tr. 407.) While Dr. Ciatti drained some abscesses and tried to save her tooth, he did not prescribe fentanyl. (No. 10-CR-14, Doc. 33, Tr. 407, 451.) Pellmann continued to administer fentanyl to Evans as her tooth was not healing and a nerve fired continuously. (No. 10-CR-14, Doc. 33, Tr. 409.) She started with injections of fentanyl one-to-two times per week and the injections were administered at the clinic, her home, or Pellmann's. (No. 10-CR-14, Doc. 33, Tr. 410-413.)

In 2009, Pellmann supplemented Evans's fentanyl injections with morphine to help her sleep. (No. 10-CR-14, Doc. 33, Tr. 414-415.) The injections were administered by Pellmann or Evans, a registered nurse. (*Id.*) Evans testified that Pellmann always knew what she had been given the day before. Notably, she never paid Pellmann for his services. (No. 10-CR-14, Doc. 33, Tr. 420.) By the time agents searched Evans's home

4

in November of 2009, Evans was using 40 to 50 vials of fentanyl daily. (No. 10-CR-14, Doc. 33, Tr. 421.) She believed Pellmann was keeping track of the morphine as well, but did not know how he kept track and had not seen the record. (No. 10-CR-14, Doc. 33, Tr. 423.) The ostensible reason Evans received the fentanyl was treatment of her Trigeminal Neuralgia, a painful nerve condition, sometimes referred to as suicide disease. (No. 10-CR-14, Doc. 33, Tr. 423, 452.) Evans described the pain to Pellmann and told him how it affected her. (No. 10-CR-14, Doc. 33, Tr. 452.) She said the pain shot past her eye, across her forehead, and her lips would quiver making it difficult to eat or drink. (No. 10-CR-14, Doc. 33, Tr. 453.) Moreover, Evans indicated the pain attacks would last four-to-ten minutes as often as every forty minutes. (No. 10-CR-14, Doc. 33, Tr. 454.) Neither vicodin nor the fentanyl patches proved to be effective. (No. 10-CR-14, Doc. 33, Tr. 455.)

Evans testified about her medical conditions and treatment by Drs. Ciatti (No. 10-CR-14, Doc. 33, Tr. 407, 450-51), Bissell (No. 10-CR-14, Doc. 33, Tr. 424, 457-60), Kuemmel (No. 10-CR-14, Doc. 33, Tr. 461-62), Michaels (No. 10-Cr-14, Doc. 33, Tr. 462-64), Rauwerdink (No. 10-CR-14, Doc. 33, Tr. 424, 465), Jensen (No. 10-CR,14, Doc. 33, Tr. 424, 465-67), Junig (No. 10-CR-14, Doc. 33, Tr. 433-440, 496), Diamond (No. 10-CR-14, Doc. 33, Tr. 500-02), Misra (No. 10-CR-14, Doc. 33, Tr. 505), and Acevedo (No. 10-CR-14, Doc. 33, Tr. 506). She also testified regarding the treatment she received from Pellmann. According to Evans, the only doctor that knew about the fentanyl was Dr. Bissell. (No. 10-CR-14, Doc. 33, Tr. 424.) Pellmann accompanied her to her first appointment, reviewed Dr. Bissell's x-rays, and talked with Dr. Bissell. (No. 10-CR-14, Doc. 33, Tr. 457-458.) Dr. Bissell, in consultation with Pellmann, decided to extract the tooth. (No. 10-CR-14, Doc. 33, Tr. 458.) Dr. Bissell also performed a bone graft because

5

Evans had osteomyelitis, an infection into the bone. (No. 10-CR-14, Doc. 33, Tr. 460.) Evans did not ask Dr. Bissell for pain medications. (No. 10-CR-14, Doc. 33, Tr. 460.) Dr. Acevedo diagnosed Evans with Trigeminal Neuralgia and Occipital Neuralgia, which Evans described as the firing of a nerve near the base of your head. (No. 10-CR-14, Doc. 33, Tr. 506.) Two weeks prior to trial, Evans saw Dr. Misra, a neuorologist, and made plans for a Botox block. (No. 10-CR-14, Doc. 33, Tr. 505.) Dr. Misra prescribed tegretol. (No. 10-CR-14, Doc. 33, Tr. 507.) In December of 2009, Dr. Junig treated Evans for her dependence on opiates, and wrote a prescription for topamax, an antiseizure medication that is not a controlled substance, for migraines. (No. 10-CR-14, Doc. 33, Tr. 321.)

Evans then saw Dr. Michaels and Kuemmel on multiple occasions because the area treated by Dr. Bissell was not healing. (No. 10-CR-14, Doc. 33, Tr. 461-462.) She purposefully did not disclose the fentanyl use to the other doctors when she completed the medical history for the other doctors. (No. 10-CR-14, Doc. 33, Tr. 424. ) She went to Dr. Jensen to see if she could get the tooth to heal, but Pellmann never referred her to a pain specialist. (No. 10-CR-14, Doc. 33, Tr. 430.) Ultimately, Evans saw six different dental professionals, and each of those multiple times. (No. 10-CR-14, Doc. 33, Tr. 467.) Evans testified that Pellmann always accompanied her for the appointments and typically discussed her care with the providers. (No. 10-CR-14, Doc. 33, Tr. 493.)

According to Evans's testimony, Pellmann never prescribed the fentanyl or morphine for recreational use, but always for her pain. (No. 10-CR-14, Doc. 33, Tr. 509.) She testified that Pellmann treated her headaches, sinus infections, bronchitis, and migraines. (No. 10-CR-14, Doc. 33, Tr. 447-448.) He even treated her daughter, Gabriella, ordered an MRI, and treated an "ankle, a foot or something, and maybe

6

sinuses." (No. 10-CR-14, Doc. 33, Tr. 447-448.) Indeed, he first ordered an MRI of Evans's back as early as 2005, and he referred her to a chiropractor and sat in the appointment. (No. 10-CR-14, Doc. 33, Tr. 446-447.) Pellmann diagnosed Evans's Trigeminal Neuralgia sometime between her appointments with Drs. Ciatti and Bissell. (No. 10-CR-14, Doc. 33, Tr. 468.) He also provided Evans with dosing charts, discussed the risk of abuse with those drugs, monitored her blood pressure, and asked her about her pain levels. (No. 10-CR-14, Doc. 33, Tr. 470-472.) He performed a breast ultrasound in August of 2009 and also administered an ultrasound of her thyroid. (No. 10-CR-14, Doc. 33, Tr. 482.) There was never a day that they did not discuss her condition, and he prescribed anti-inflammatories such as toradol. (No 10-CR-14, Doc. 33, Tr. 491-492.)

Additionally, Pellmann's lawyer introduced medical records via a stipulation reflecting Evans's treatment by Drs. Bissell, Rauwerdink, and Michaels. (No. 10-CR-14, Doc. 34, Tr. 628-29, Exs. 118-120.) Dr. Jensen testified regarding the procedures he supervised, including a bone graft. (No. 10-CR-14, Doc. 32, Tr. 42.) Pellmann himself testified about Evans's medical condition as well as his own diagnosis and treatment, and acknowledged that he did not document this diagnosis or treatment. (No. 10-CR-14, Doc. 34, Tr. 651-58, 684-86.) That Pellmann now feels he did not make a good witness because he was anxious does not render counsel's decision not to call another witness ineffective.

Pellmann's arguments in support of his claim of ineffective assistance of counsel cite evidence received after the trial. However, counsel cannot be ineffective for failing to produce documents that did not exist. Moreover, one of the documents is dated July 23, 2010, which is in contravention of the court's instruction after the guilty finding that

7

Pellmann was to "have no contact whatsoever with Miss Evans." (No. 10-CR-14, Doc. 35, Tr. 912). And, while Pellmann argues that the government didn't use an expert because it knew his treatment was proper, it is apparent on the record that the governmet didn't use an expert because it didn't need one. On appeal, the Seventh Circuit rejected Pellmann's argument that the government needed expert testimony to prove its case where a physician-defendant was charged with violating § 841(a)(1). *Pellmann*, 668 F.3d at 924. Indeed, a jury can reasonably find that a doctor prescribed controlled substances not in the usual course of professional practice or for other than a legitimate medical purpose from adequate evidence, including lay witness testimony respecting the facts and circumstances of the drugs at issue. *Id.* (quoting *United States v. Armstrong*, 550 F.3d 382 (5th Cir. 2008), overruled on other grounds by *United States v. Guillermo Balleza,* 613 F.3d 432, 433 (5th Cir. 2010)).

Ultimately, counsel's performance was not deficient inasmuch as Evans discussed her medical history, diagnoses and treatment in detail and Pellmann discussed his diagnosis and treatment. Evans testified that Pellmann was her treating physician and had treated her for everything from sinusitis to back pain. She described her discussions with Pellmann and his discussions with her other doctors. On the other hand, Pellmann himself discussed Evans's condition and treatment, and Pellmann's attorney introduced Evans's medical records.

The expert Pellmann says he would have called, Dr. Misra, saw Evans for the first time two weeks prior to her testimony. However, Dr. Misra's testimony would not have negated the fact that Evans concealed the fentanyl use from her treating physicians, other than Pellmann, and that the overwhelming evidence made clear that the drugs that

8

Pellmann administered to Evans were not provided in the usual course of professional practice.

Between March 2009 through November of 2009, Pellmann–a radiologist–operating an imaging clinic and a vein and laser clinic, administered approximately 14,000 vials of fentanyl and substantial quantities of morphine to Evans. (No. 10-CR-14, Doc. 34, Tr. 566-67, Ex. 128; Tr. 561-62, 722, 727, Ex. 126 and 127.) He had no records of treating Evans in 2009, and did not document the quantities, proportions or frequency of the narcotics he provided. These medications were administered to Evans in her home or Pellmann's home, and Pellmann allowed Evans to give herself injections as frequently as every 40 or 50 minutes. Notably, no other physician prescribed fentanyl or morphine.[2]

Next, Pellmann asserts that counsel was ineffective in failing to protect him "from due process abuses by the prosecution." He maintains that there was "falsification of evidence" by DEA Diversion Investigator Kathy Federico. Federico claimed that her search on January 14, 2010, recovered 144 ampules of fentanyl from a locked cabinet in the clinics. (No. 10-CR-14, Doc. 32, Tr. 146.) However, Pellmann says he inspected the cabinet on January 14, 2010, and insists that 271 remained. He locked the cabinet and gave the keys to the DEA., leading him to surmise that the DEA agents illegally possessed 127 ampules. (No. 10-CR-14, Doc. 32, Tr. 145-146, 181-83.)

While Pellmann offers no support for these allegations, he also fails to explain how the discrepancy of 127 fentanyl ampules would warrant reversal of his conviction that was otherwise supported by "substantial evidence." The evidence presented at trial included

---

[2] Dr. Jensen testified that he administered fentanyl during a procedure but did not write Evans a prescription for future use.

9

Pellmann's testimony, Evans's testimony, records from Walgreens, and the results of searches that were conducted at Pellmann's clinic and residence.

In further support of his claim of prosecutorial abuse, Pellmann argues that Federico should not have been allowed to testify that Evans was an addict, suggest that he falsified Evans's medical records after his arrest, or otherwise transposed the names of Drs. Jensen and Bissel when she testified regarding conversations with Pellmann about Evans's pain management treatment. However, Pellmann misstates Federico's testimony inasmuch as Federico did not testify that Evans was an addict but rather testified that Pellmann told her during the November 12, 2009, search of his clinic that he was worried about Evans's addiction. (No. 10-CR-14, Doc. 32, Tr. 138-39.) On cross-examination by defense counsel respecting this point, Federico again testified that it was Pellmann who used the word "addiction." (No. 10-CR-14, Doc. 32, Tr. 163.) Along the same lines, Federico testified that Pellmann admitted his treatment of Evans was outside the scope of his practice and that he did not maintain a patient file for his diagnosis and treatment of Evans prior to the search of his clinic on November 12, 2009. (No. 10-CR-14, Doc. 32, Tr. 139, 684-86.) Further, Federico's "suggestion" that Pellmann falsified records was really testimony regarding a stipulation that the parties reached concerning the progress notes that Pellmann e-mailed to his lawyer on January 15, 2010–after his arrest–that were not received by the government until March 4, 2010. (No. 10-CR-14, Doc. 18 at ¶ 20.) Finally, Federico's testimony respecting Dr. Jensen was not an issue at trial but rather at sentencing where the court's finding that Pellmann's false testimony resulted in a two-level enhancement for obstruction. Thus, it is unclear to this court how Dr. Bissell's testimony would have helped Pellmann, particularly considering that the Seventh Circuit addressed

the testimony regarding Dr. Jensen on appeal and affirmed the enhancement finding that the district court was in the best position to assess Pellmann's credibility. *Pellmann*, 668 F.3d at 927. Hence, counsel's performance was not deficient with respect to Federico and Pellmann cannot establish prejudice.

Pellmann further asserts that his lawyer failed to challenge the credibility of DEA Special Agents Greg Connor and Jill Ceran. He notes that these agents photographed a bar-coded box of medical supplies in his bathroom and then photographed the same bar-coded box in the living room, with its contents scattered all over the furniture. Pellmann maintains these agents also photographed the trash from the disposal containers and claimed that was how they found the premises. Additionally, he submits that these officers stole his camcorder on November 12, 2009, then returned it to his clinic on January 14, 2010. Pellmann also contends, the agents removed a lab coat from a hanger, rolled into a ball, and stuffed in the corner of his closet.

Notably, Pellmann does not complain that the items in the photographs were not found in his residence or in the garbage. Nor does he complain that the camcorder or the lab coat were used against him. Moreover, the government only called Greg Connor whose testimony was limited to his involvement in the November 12, 2009, search. Moreover, the parties stipulated that the exhibits introduced through Connor were "items and/or photographs of items that were found by federal agents at the Defendant's residence located in New Berlin, Wisconsin on November 12, 2009." (No. 10-CR-14, Doc. 33, Tr. 216.) Connor testified where he found the items. For example, he explained that the IV bags were pulled out and placed in one location on the floor for the photograph. (No. 10-CR-14, Doc. 33, Tr. 225.) Defense counsel cross-examined Connor concerning

11

how the items appeared when he and Ceran found them. (No. 10-CR-14, Doc. 33, Tr. 231-233.) Consequently, the court finds that Pellmann was not subjected to undue prejudice with respect to Connor's testimony or that defense counsel's representation was substandard with regard to Connor's testimony.

Other issues cited by Pellmann include his counsel's instruction that he not possess any medication which caused him to dispose of 40 vials of midazalom. Pellmann maintains that counsel did nothing to correct the impression that these medications weren't accounted for or that addiction was synonymous with withdrawal. Additionally, according to Pellmann, he wanted counsel to subpoena Lisa Evans to reveal that "she was the envious drug seeking sister-in-law who perpetrated a malicious hoax." (No. 12-C-1242, Doc. 2 at p. 12.) Pellmann further asserts that subsequently, counsel failed to inform the court that Ms. McGrath posted some communication on Facebook following her testimony at trial and that the government violated HIPPA inasmuch as the Journal/Sentinel published an article revealing that he treated Evans with narcotics for an impacted tooth. Lastly, Pellmann charges that Agent Reid's analysis of the number of prescriptions for Evans never took into account that the dosing was within FEDA guidelines and the quantity never exceeded a 3-to-7 day supply.

With respect to counsel's instructions to Pellmann that he dispose of the medications, it appears that the instruction was given after the trial in June of 2010, while Pellmann was on bond after his conviction. Hence, counsel's performance had no impact on Pellmann's conviction. Nor was counsel deficient in failing to call Lisa Evans, who was not a witness, for the sole purpose of impeaching her. Pellmann's proposed impeachment of Lisa Evans did not impact the outcome of his trial because she did not testify. Moreover,

12

Lisa Evans's motives for contacting the government do not undermine the strength of the government's case. Instead, they may simply explain why the government launched its investigation. Similarly, Pellmann's argument regarding the Facebook post fails because Pellmann has not provided evidence that there was a post or that a Facebook post was seen by any juror. Additionally, the court instructed each witness not to discuss his or her testimony with anyone and also instructed the jury not to discuss the case, do any research or "get on any social networking blog or web site or means of communication." (No. 10-CR-14, Doc. 32, Tr. 168.) Jurors were further instructed to alert the court to anyone who attempts to discuss the case with them. (*Id.*)

Pellmann's arguments regarding DEA Investigator Laura Reid fail because Walgreens's data was admitted pursuant to a stipulation and Pellmann's lawyer cross-examined Reid about the weaknesses in her testimony. (No-Cr-14, Doc. 32, Tr. 85-86.) For example, Reid had not searched all pharmacies that patients had used to fill their prescriptions, thereby skewing her statistics with respect to Evans.

Last, Pellmann focuses on counsel's failure to object to the jury instructions for the alleged violations of 21 U.S.C. § 843(a)(3). The section provides:

> It shall be unlawful for any person knowingly or intentionally ... to acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception or subterfuge.

21 U.S.C. § 843(a)(3). Accordingly, the jury was instructed as follows:

OBTAINING MORPHINE BY MISREPRESENTATION,
FRAUD, AND DECEPTION
21 U.S.C. § 843(a)(3)

> To sustain the charge of knowingly and intentionally obtaining a controlled substance by misrepresentation, fraud or deception, as charged

in Counts Eleven through Sixteen, the government must prove the following propositions as to each count:

> First, that Roger A. Pellmann, M.D., knowingly and intentionally acquired or obtained morphine sulfate as charged;
>
> Second, that Roger A. Pellmann, M.D., did so by misrepresentation, fraud, or deception; and
>
> Third, that at the time of the making of the representation or representations, Roger A. Pellmann knew the representation or representations were false, fraudulent or deceptive.
>
> If you find from your consideration of all of the evidence that each of these propositions has been proven beyond a reasonable doubt as to the count you are considering, then you should find the defendant guilty of that count. If on the other hand, you find from your consideration of all of the evidence that any one of theses propositions has not been proven beyond a reasonable doubt as to the count you are considering, then you should find the defendant not guilty as to that count.

(No. 10-CR-14, Doc. 21, Tr. 15.)

Pellmann argues that counsel should have disclosed to the jury that he was authorized to acquire controlled substances through the DEA's registration of him as an individual practitioner rather than a business. All that was required of him was that he use the forms to acquire the substances. Pellmann further argues that counsel should have known that a conviction requires some "misrepresentation, fraud, forgery, deception, or subterfuge" and there was no showing that he ever acquired or obtained possession illegally. *See United States v. Wilbur,* 58 F.3d 1291 (8th Cir. 1995).

The court's instruction was consistent with the code and properly advised the jury that the government must prove that Pellmann knowingly obtained morphine by "misrepresentation, fraud, or deception." The evidence at trial was sufficient for a reasonable jury to return a guilty verdict because it was shown that Pellmann wrote

14

prescriptions for morphine falsely indicating on DEA Form 222 that they were for office use. These prescriptions were filled at Ye Olde Pharmacy, and morphine was also ordered from Anda Pharmaceutical and McKesson Corporation, through Pellmann's medical clinic to make it appear that Pellmann was using morphine in his practice. Pellmann acknowledged at trial that he did not use morphine in the clinic and admitted to injecting himself and Evans with the morphine. Pellmann's clinic staff also confirmed that morphine was not used in the clinic.

Because Pellmann's § 2255 motion fails on the merits, the court must decide whether to issue a certificate of appealability. Rule 11(a), Rules Governing Section 2255 Proceedings. Pellmann's motion does not make a substantial showing that jurists of reason could reasonably disagree with the court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further. *Miller–El v. Cockrell*, 537 U.S. 322, 327 (2003). Therefore,

IT IS ORDERED that Roger Pellmann's § 2255 motion is denied.

IT IS FURTHER ORDERED that this case is dismissed.

IT IS FURTHER ORDERED that a certificate of appealability is denied.

Dated at Milwaukee, Wisconsin, this 18th day of May, 2015.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE